ANDREWS et al. v. MILLER et al.

(Circuit Court of Appeals, First Circuit. February 2, 1895.)

No. 109.

CONTRACTS—INTERPRETATION.

Plaintiffs and defendants entered into a contract by which plaintiffs agreed to load on a barge at the port of B. 1,600 tons of ice, for which the defendants agreed to pay them $2.50 per ton on draft at one day's sight, guarantying this amount to plaintiffs at all events. Defendants were also to transport the ice to New York, and pay the cost of transportation and discharging at New York, and were to sell the ice for the best price obtainable, and pay plaintiffs one-half the net profit, after deducting from the selling price the $2.50 per ton, and the expense of transportation and sale. The ice was to remain the property of plaintiffs until sold and paid for. Upon the arrival of the ice at New York, the price being depressed, defendants requested plaintiff to defer drawing for the amount of the payment at $2.50 per ton, which they did for a few days, but then notified defendants that they wanted the contract performed, and drew a draft for the amount due, which was protested for nonacceptance, and later for nonpayment. Plaintiffs' agent demanded the ice from the master of the barge, but he refused to deliver it, unless indemnified against any claim of defendants, who had notified him not to deliver. The owner of the barge libeled plaintiffs' agent for the amount due for charter of the barge which defendants had agreed to pay, and plaintiffs' agent libeled the barge for damage which the ice, when unloaded, was found to have suffered by the escape of steam, and, after setting off the amounts allowed on the two libels, plaintiffs were obliged to pay $746.83. They also paid for towage of the barge at New York, costs of protest, care of and weighing the ice, and expenses of sale of the ice, which they sold for the best price obtainable, realizing only a small amount. *Held,* that the contract was not one of sale, but a special contract, by which defendants undertook, in consideration of plaintiffs' shipment of the ice, to pay them $2.50 per ton before the ice should pass out of their control, and that, defendants having failed to perform their part, without fault on plaintiffs' part, plaintiffs were entitled to take and dispose of the ice, and to recover the agreed amount at $2.50 per ton, together with the expenses they had been obliged to pay at New York, less the amount realized from the sale of the ice.

In Error to the Circuit Court of the United States for the District of Maine.

This was an action brought by William L. Miller, Charles H. Bartlett, William E. Baxter, and Everett T. Nealey, partners as Treat's Falls Ice Company, against Wallace C. Andrews, Thomas R. McNeal, Carroll L. Riker, and John F. Huckel, partners as C. L. Riker, for the sum of $5,282.58, due upon a certain contract in writing. The action was brought in the supreme judicial court of the state of Maine. The defendants, being citizens of the state

of New York, had the case removed to the circuit court, where they appeared and pleaded. The cause was submitted to the court, trial by jury being waived. The court found the facts, and the conclusions of law thereon, as follows:

The facts found are:

(1) The plaintiffs were engaged in the business of cutting, storing, and selling ice at Bangor, Me.

(2) The defendants were dealing in ice in New York.

(3) On the 12th day of August, 1890, the parties entered into a written agreement, as follows:

"First. The parties of the first part [the plaintiffs] agree to load at the port of said Bangor, at some dock having at least twelve feet of water at low tide, sixteen hundred (1,600) tons of good merchantable ice, cut on the Penobscot river, on board the barge Saugerties, now on the way to said Bangor.

"Second. The parties of the second part [the defendants] agree to tow said barge, when loaded as aforesaid, with all reasonable speed to the port of New York, and there sell the said cargo for the best price obtainable.

"Third. The parties of the second part agree to pay a draft, on one day's sight, drawn on them by the parties of the first part, for the amount of said cargo, at two and fifty one-hundredths dollars per ton as weighed in said Bangor by a sworn weigher, a certificate of the weight of said cargo to be attached to said draft, together with the bill of lading, and said two and fifty one-hundredths dollars per ton is guarantied to the parties of the first part by the parties of the second part. and is to be paid to them in any event. except in case of loss of said barge or its cargo, as provided in sect. 9. From the proceeds of the sale of said cargo in New York the parties of the second part are to have one and fifty one-hundredths dollars per ton freight, one half the cost of towing in and out of the Penobscot river, and the cost of discharging said cargo.

"Fourth. The parties of the first part agree to load from two hundred to two hundred and fifty tons per day, and for every ton over two hundred and fifty tons which they average the parties of the second part agree to make a reduction of twenty cents per ton from the freight.

"Fifth. The parties of the second part agree to advance all necessary expenses incurred after said cargo leaves the port of Bangor.

"Sixth. Said cargo is to remain the property of the parties of the first part until sold and paid for.

"Seventh. The net profits of said cargo, assuming two and fifty one-hundredths dollars per ton, weighed as aforesaid, as the basis of cost on board said barge at Bangor, are to be equally divided between the parties of the first and second parts.

"Eighth. Immediately after the sale of said cargo, the parties of the second part agree to furnish the parties of the first part with a detailed statement of the receipts and expenses of said cargo, together with a check for their share of the net profits.

"Ninth. In the event of the loss of said barge or its cargo, or the loss of the ice in the ice houses of the parties of the first part in said Bangor, this contract shall at once terminate and become void, and the two and fifty one-hundredths dollars per ton paid as aforesaid is to be returned to the parties of the second part."

Afterwards, by mutual agreement in writing of the parties, this contract was so modified that the quantity of ice to be shipped was changed to 1,638 19/80 tons, instead of 1,600 tons, but in all other respects was continued unchanged. Pursuant to this agreement, at Bangor, 1,638 19/80 tons of good merchantable ice, cut on the Penobscot river, was shipped by the plaintiffs on board the Saugerties, which was under charter to the defendants at $50 per day. The barge, with this cargo on board, left Bangor August 30th, and arrived near New York September 5th. On the 28th of August, the market price of ice at New York being then depressed, Riker, one of the defendants, who took the active management of this business, wrote to the plaintiffs, requesting them not to draw at one day's sight, with the bill of lading, for the amount of the shipment according to the contract, and promised to pay the amount before he unloaded the cargo. To this, reply was made that one of

the plaintiffs would see Riker in New York. September 5th Mr. Bartlett, one of the plaintiffs, was in New York, and had several interviews with Riker and one of his partners, without referring to any draft. On the 12th of September, the ice in the meantime having remained on board the barge unsold, Bartlett told Riker he wanted the contract performed, and on the 13th gave notice that he had determined to draw; on the 15th a draft at one day's sight was drawn on Riker by Bartlett in the name of his company for $4,000, to which was attached the weigher's certificate and the captain's copy of the bill of lading. Bartlett had left the other copies of the bill of lading at Bangor, and had obtained the captain's copy for the express purpose of attaching it to the draft. This draft was duly protested for nonacceptance, and again, on the 19th, for nonpayment. No arrangement having been reached by the parties, the plaintiffs, by Bartlett, executed a bill of sale of the ice to one Smith, and indorsed and delivered to him the captain's copy of the bill of lading that had been attached to the draft, but this transfer was merely for the convenience of the plaintiffs in the transaction of subsequent business in regard to the ice in New York. As between Smith and the plaintiffs, no sale of the cargo was intended. It was only a convenient method of appointing and authorizing an agent to manage the cargo for them. On the day that he received this bill of sale, and the bill of lading attached to it, Smith demanded of the owner and captain of the barge, under these documents, a delivery of the cargo. They refused to make such delivery unless they were indemnified against any claim of Riker and partners, who notified the owner not to deliver the ice to Smith, and that he would do so at his peril. Smith libeled the barge in the United States district court in the Southern district of New York for the nondelivery of the cargo. The owner of the barge libeled Smith for the amount due under the charter. When the ice was finally discharged from the barge, it was found to have been damaged and wasted by the escape of steam into the cargo, and was generally in bad condition, and Smith libeled the barge for this damage and waste. All these libels were heard and disposed of in the same court. The first was dismissed as prematurely brought; on the second, the sum of $2,500 and costs was decreed due for the use of the barge for 57 days from August 30th, during which time the ice was on board, less 7 days for which the barge was held responsible; and on the third, damages for injury of the cargo by the fault of the barge by suffering steam to escape into it, in the sum of $1,900 and costs, were decreed to the libelant, and the amount was ordered to be set off against the amount of the decree of the second libel. The difference between the two decrees was $746.83, and was paid to the owners of the barge by these plaintiffs, through Smith, the nominal party in the libels. The plaintiffs also paid bills of the attorneys for services, and $35 for towage of the barge at New York; $1.98, costs of protest of their draft; $105 for care of and weighing out the cargo; and $53.53, expenses of sale and commissions. After considerable delay, and after Riker, when, on the 24th of September, another copy of the bill of lading having been received, withdrew his objection to delivery of the ice, the owners of the barge consented that the cargo should be delivered to Smith, who was only the agent of the plaintiffs, upon his promise to pay $50 a day for the use of the barge. The plaintiffs, through Smith, negotiated a sale of the ice at $3.50 per ton, but, after the discharge of 80 tons, it was found to be damaged and in bad condition, and the acceptance of more was refused. The 80 tons delivered have not been paid for at any price. Failing to find purchasers for the remainder at private sale, the plaintiffs advertised and sold it at public auction. It brought $288.95, at 65 cents per ton. The plaintiffs and Smith, their agent, used all proper efforts to avoid loss on the sale, and to protect all interests. The defendants utterly failed to advance the freight and other expenses of the cargo, or to pay the guarantied price. They took no effective steps to find purchasers, or to provide for the protection and disposal of the ice. After all negotiations for carrying out the contract or for adjusting the business had failed, and when the cargo, from its nature, was wasting and shrinking in value, they interposed further delay by forbidding the barge to deliver it to the owners. The plaintiffs, when they had finally gained control of the ice, made all reasonable efforts to sell it to the best advantage, and so far as possible to protect against loss all parties interested.

### Conclusions.

The contract between these parties cannot be treated as a sale. In some aspects it was like a shipment on joint account, with special terms. If it be regarded as a partnership in a particular adventure, those conditions of the copartnership by which the defendants were to secure to the plaintiffs at least $2.50 per ton at in-take weight for the ice shipped, and were themselves to bear all losses, must be regarded. It is better to treat it as a special contract, according to its terms, by which the defendants undertook, in consideration that the plaintiffs would ship the ice, to return to them, free of any expense, $2.50 per ton, before the property should pass out of the control and custody of the shippers. This action proceeds on that view, and is for damages for the breach of such a contract. Whatever view be taken of the nature of the contract, the same result will be reached. The defendants have wholly failed to perform their part of it. They have not been prevented by any wrong on the part of the plaintiffs. The loss of the plaintiffs from the defendants' breach is the same and the damages suffered by them are the same, under any interpretation of the contract. No act or acts of the plaintiffs can be held as a waiver of its terms. The only question is, what are the damages which plaintiffs should recover?

| | | |
|---|---:|---:|
| The 1,638$^{19}/_{80}$ tons at $2.50 amount to | | $4,095 59 |
| Of this plaintiffs have received from auction sale the sum of | $288 95 | |
| They are chargeable with value of the 80 tons delivered and accepted, on the private sale, before rejection of rest, amounting to | 280 00 | |
| | | 568 95 |
| Leaving a remainder or | | $3,526 64 |
| They should also recover cost of protest | $ 1 98 | |
| Towage | 35 00 | |
| Care of cargo and expense of weighing out | 105 00 | |
| Excess of decree in favor of barge, for her use | 746 83 | |
| Commissions and expenses of sale | 53 53 | |
| | | 942 34 |
| | | $4,468 98 |

In addition to these items the plaintiffs claim allowance of their counsel fees and expenses of litigation in New York. These expenses were not a result of the defendants' failure to perform their contract, nor did the defendants contract to bear them. The claim for these expenses is disallowed. The plaintiffs are also entitled to interest from the date of the writ.

From this decision of the court, writ of error was allowed to this court.

Arno W. King and Clarence Hale, for plaintiffs in error.

Charles H. Bartlett and Charles F. Woodard, for defendants in error.

Before COLT and PUTNAM, Circuit Judges, and NELSON, District Judge.

PUTNAM, Circuit Judge. The plaintiffs in error have not undertaken to show, either to this court or the court below, that the damage to the ice by steam occurred before the arrival of the cargo at New York; nor have they based any defense on any theory of that character, or secured proper findings to enable us to determine the merits of such a defense, if it had been urged on us. Therefore we refrain from passing on any questions of that nature. The prop-

ositions submitted to us arise from the conclusions stated in the court below, as follows:

"The contract between these parties cannot be treated as a sale. In some aspects it was like a shipment on joint account, with special terms. If it be regarded as a partnership in a particular adventure, those conditions of the copartnership by which the defendants were to secure to the plaintiffs at least $2.50 per ton at in-take weight for the ice shipped, and were themselves to bear all losses, must be regarded. It is better to treat it as a special contract, according to its terms, by which the defendants undertook, in consideration that the plaintiffs would ship the ice, to return to them, free of any expense, $2.50 per ton, before the property should pass out of the control and custody of the shippers. This action proceeds on that view, and is for damages for the breach of such a contract. Whatever view be taken of the nature of the contract, the same result will be reached. The defendants have wholly failed to perform their part of it. They have not been prevented by any wrong on the part of the plaintiffs. The loss of the plaintiffs from the defendants' breach is the same, and the damages suffered by them are the same, under any interpretation of the contract. No act or acts of the plaintiffs can be held as a waiver of its terms."

We agree to these expressions. Under the circumstances the plaintiffs below were entitled, for their own protection, to make the best of the ice which they could by reasonable efforts, after the defendants below refused to accept it, and they are accountable only for the net proceeds. They have been charged with these by the court below. In attempting to secure the net proceeds, they paid the freight, which the defendants below were holden to pay in any event, and the latter cannot complain that, in the computations of the court below, they were charged with it. The plaintiffs below were charged with the net amount they recovered from the barge for damage to the ice. Therefore, on the principles of law applicable to persons who are compelled to intervene to save property unjustly thrown back on their hands, the plaintiffs below have been credited and debited with the various sums with which they should have been. These principles are so familiar that we do not deem it necessary to elaborate them. The judgment of the circuit court is affirmed.